UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

INTERKAL, LLC,

      Plaintiff,

v.

GIGA SOLUTIONS, INC., 2F, INC., and
MYUNG S. KIM,

      Defendants.

                                      /

File No. 1:14-CV-337

HON. ROBERT HOLMES BELL

# OPINION

## I. Introduction

This is a diversity action for breach of warranties and breach of contract. Plaintiff Interkal, LLC, a company that manufactures stadium and bleacher seating in Michigan, alleges that Defendant Giga Solutions, Inc., a Texas company, sold defective and malfunctioning electric motors to Interkal for use in their automated bleacher systems. Plaintiff has also brought claims against Defendants 2F, Inc., and Mr. Myung Kim, both Texas residents, alleging that 2F is liable as a continuation of Giga Solutions, and that Kim is liable as the alter ego of Giga under a veil-piercing theory. Pending before the Court is Defendants' motion to dismiss Kim and 2F for lack of personal jurisdiction, or for judgment on the pleadings. (ECF No. 25). Plaintiff has filed a response (ECF No. 37), to which Defendants have replied (ECF No. 39). For the reasons that follow, Defendants' motion will be granted.

## II. Factual Background

In 2010, Interkal ordered 4000 electric gear motors from Giga to be delivered at specified intervals for use in Interkal's automatically-collapsing bleachers. Within the two-year warranty period, several motors stopped working properly. Even after repair, some motors still malfunctioned. Interkal asserts that it provided Giga a reasonable time to cure before initiating the present lawsuit on April 2, 2014. Interkal seeks to pierce the corporate veil of Giga in order to hold its shareholder Myung Kim personally liable and to hold 2F liable as the successor to Giga.

**A. Defendant Kim**

Defendant Myung Kim ("Kim") was born in South Korea and currently resides in Lewisville, Texas. (Kim Dep. 5-6, ECF No. 37, Ex. A.) Kim moved to the United States in 2000 at the age of 25, enrolled in an English as a Second Language course, and began a Masters of Business Administration (MBA) program at Middle Tennessee State. (*Id.* at 5-7.) While in school, Kim was involved in a small Korean community in Nashville, where he met CS Kim ("CS") at his church. (*Id.* at 51-52, 14-15.) CS told Kim that Kim would be eligible to stay in the United States legally after graduation under an E-1 Visa, provided that Kim created a company that did international trading brokerage. (*Id.* at 15-16.) At the time, Kim had no connections to companies in China, Taiwan, or Korea, but CS did. (*Id.*) Giga Solutions was formed in 2005 under Kim's name. (*Id.* at 20.) Although Kim was 100 percent

owner, he considered CS to be his boss. (*Id*. at 17-20.) Kim stated that he is "[j]ust paper owner to keep my status." (*Id*. at 20.)

CS managed most aspects of Giga, and Kim considered it to be CS's company. (*Id*. at 25.) CS directed Kim to stay in Nashville and then to move to Dallas to develop a client base. (*Id.* at 51-52.) CS had authority to enter into contracts on behalf of Giga. (*Id*. at 25.) Kim did not have authority to write any checks or make payments. (*Id*. at 37.) Kim had no involvement in the financial aspect of the business until CS left the company in 2011. (*Id.* at 28.) Kim does not know what a registered agent is, what an election of directors is, nor does he know whether Giga ever held formal meetings or maintained minutes. (*Id*. at 25-26.) He may have seen by-laws at some point after he moved to Dallas in 2005. (*Id.*)

Sometime around 2011, CS left Giga and moved to Atlanta, Georgia. In 2013, Kim sold 51% of Giga to Mr. Jeong Hee O to help Mr. O obtain an E-1 visa to stay in the United States legally. (*Id.* at 75, 79.) Giga has records of a September 16, 2013, "meeting," the minutes of which state that the Chairman called for further nominations, the minutes of the previous meeting were read, and the President gave a general report of the business and finances. (Defs.' Br. Ex. D, ECF No. 24.) Kim admits, however, that none of this is true. (Kim Dep. 81-87.) An immigration attorney prepared the minutes for the purpose of making Mr. O a shareholder in Giga. (*Id*. at 81.)

**B. Defendant 2F**

Defendant 2F is a business, incorporated in Texas, that operates a Japanese restaurant called "Fast & Furious" in Irving, Texas. (2F Certificate of Formation, Defs.' Br. Ex. B.) Kim is the sole shareholder of 2F. (Kim Aff. ¶ 4.) Fast & Furious has no locations, offices, employees, or business connections in Michigan. (*Id*. at ¶ 6-8.) 2F maintains separate books, records, and bank accounts from Giga. (*Id*. at ¶ 8.) 2F has not assumed Giga's liabilities. (*Id*. at ¶ 10.)

### III. Personal Jurisdiction

Where, as here, the Court decides a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction without conducting an evidentiary hearing, the plaintiff bears the burden of making a prima facie showing that the court has personal jurisdiction over the defendant. *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 887 (6th Cir. 2002); *see also Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988) (describing the burden on the plaintiff in such a case as "relatively slight"). To meet this burden, the plaintiff must establish "with reasonable particularity" sufficient contacts between the defendant and the forum state to support jurisdiction. *Neogen*, 282 F.3d at 887; *see also See, Inc. v. Imago Eyewear Pty, Ltd.*, 167 F. App'x 518, 520-21 (6th Cir. 2006) ("[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleadings but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction."). In evaluating the plaintiff's response to the motion to dismiss, the Court construes the facts in

4

the light most favorable to the plaintiff and disregards contradictory evidence proffered by the defendant. *Neogen*, 282 F.3d at 887.

"In analyzing personal jurisdiction in diversity actions [], federal courts must look to the law of the forum state to determine the reach of the district court's personal jurisdiction over parties, subject to constitutional due process requirements." *Air Prods. and Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544,550 (6th Cir. 2007). In Michigan, this requires a two-step process: "(1) first, the court must determine whether any of Michigan's relevant long-arm statutes authorize the exercise of jurisdiction over Defendants; and, if so, (2) the court must determine whether exercise of that jurisdiction comports with constitutional due process." *Id.*

Michigan's long-arm statute governing specific personal jurisdiction of an individual provides that

> The existence of any of the following relationships between an individual or his agent and the state shall constitute a sufficient basis of jurisdiction to enable a court of record of this state to exercise limited personal jurisdiction over the individual and to enable the court to render personal judgments against the individual or his representative arising out of an act which creates any of the following relationships:
> (1) The transaction of any business within the state.
> * * *
> (4) Contracting to insure a person, property, or risk located within this state at the time of contracting.
> (5) Entering into a contract for services to be rendered or for materials to be furnished in the state by the defendant.

Mich. Comp. Laws § 600.705.

5

Due process concerns are governed by the standard articulated in *International Shoe* and expounded by its progeny: ensuring a defendant has "certain minimum contacts with [the forum state] such that maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

In addition to the "minimum contacts" analysis required by *International Shoe,* the question of due process in the context of establishing specific personal jurisdiction turns on whether "the defendant's conduct and connection with the forum State are such that [the defendant] should reasonably anticipate being haled into court there." *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297 (1980). The Sixth Circuit has formulated a three-prong test to evaluate whether exercising specific personal jurisdiction satisfies due process:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir.1968).

### IV. Piercing the Corporate Veil as to Kim

Plaintiff argues that this Court has personal jurisdiction over Kim because this Court is entitled to pierce Giga's corporate veil and find that Kim is the alter ego of Giga. "Federal courts have consistently acknowledged that it is compatible with due process for a court to exercise personal jurisdiction over an individual or a corporation that would not ordinarily

6

be subject to personal jurisdiction in that court when the individual or corporation is an alter ego or successor of a corporation that would be subject to personal jurisdiction in that court." *Estate of Thomson ex re. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008) (quoting *Patin v. Thoroughbred Power Boats Inc.,* 294 F.3d 640, 653 (5th Cir. 2002)). Thus, the alter ego theory of personal jurisdiction permits the Court to impute personal jurisdiction from the corporation to its shareholders or successors. *Id.*

The Court first addresses whether to employ Michigan or Texas law when piercing the corporate veil and applying the alter ego theory. The Court next addresses whether Plaintiff has presented a prima facie case justifying piercing Giga's corporate veil and declaring that Kim is the alter ego of Giga.

### A. Choice of Law

The first issue ripe for decision is the appropriate application of state law in this diversity suit. Plaintiffs argue that Michigan law applies, because Michigan is the forum state. Defendants argue that Texas law applies because that is the state where Giga Solutions is incorporated. Neither party has sufficiently supported their position with case law, but this Court determines that no actual conflict exists between the substantive law of the interested jurisdictions in this case.

In general, Michigan law "treats a corporation as an entirely separate entity from its stockholders, even where one person owns all the corporation's stock." *Foodland Distrib. v. Al-Naimi*, 559 N.W.2d 379, 381 (Mich. Ct. App. 1996). *See also RDM Holdings, LTD v.*

7

*Cont'l Plastics Co.,* 762 N.W.2d 529, 550 (Mich. Ct. App. 2008) (quoting *Rymal v. Baergen,* 686 N.W.2d 241 (Mich. Ct. App. 2004)). Michigan courts have applied the following standard for piercing the corporate veil:

> First, the corporate entity must be a mere instrumentality of another entity or individual. Second, the corporate entity must be used to commit a fraud or wrong. Third, there must have been an unjust loss or injury to the plaintiff.

*Id.* (quoting *SCD Chem. Distrib., Inc. v. Medley*, 512 N.W.2d 86, 90 (Mich. 1994)). The Sixth Circuit has considered factors including "undercapitalization of the corporation, the maintenance of separate books, the separation of corporate and individual finances, the use of the corporation to support fraud or illegality, the honoring of corporate formalities, and whether the corporation is merely a sham." *Laborers' Pension Trust Fund v. Sidney Weinberger Homes, Inc.,* 872 F.2d 702, 704-05 (6th Cir. 1988) (citing *Lakota Girl Scout Council, Inc. v. Harvey Fund-Raising Mgmt., Inc.*, 519 F.2d 634, 638 (8th Cir. 1975)).

Texas law likewise generally insulates corporate officers and shareholders from personal liability for corporate obligations. *Endsley Elec., Inc. v. Altech, Inc.*, 378 S.W.3d 15, 22 (Tex. App. 2012). Texas courts may pierce the corporate veil when "the corporate form has been used as an alter ego of another person or corporation . . ." *Id*. at 23 (citing *SSP Partners v. Gladstrong Inc. (USA) Corp.*, 275 S.W.3d 444, 451 (Tex. 2008)). Under Texas law, the alter ego doctrine is one theory used to pierce the veil; other theories include when the corporate form "has been used to perpetrate a fraud, evade an existing obligation, create a monopoly, circumvent a statute, protect a crime, or justify a wrong." *Endsley Elec.*, 378

8

S.W.3d at 22 (citing *SSP Partners*, 275 S.W.3d at 451.) An alter ego relationship may be shown by evidence of "the degree to which corporate formalities have been followed and corporate and individual property have been kept separately, the amount of financial interest, ownership and control the individual maintains over the corporation, and whether the corporation has been used for personal purposes." *Mancorp, Inc., v. Culpepper*, 802 S.W.2d 226, 228 (Tex. 1990) (quoting *Casteberry v. Branscum*, 721 S.W.2d 270, 272 (Tex. 1986)). *See also Endsley Elec.*, 378 S.W.3d at 23-24.

### B. Analysis

Here, the Court finds that Giga Solutions has failed to honor corporate formalities. The lack of formal meetings, minutes, by-laws, updated contact information for a registered agent, and regular elections are evidence that Giga has not adhered to the obligations of its corporate form.

The record presently before the Court demonstrates that Giga suffered inadequate capitalization at the time it entered into its contract with Interkal. Mr. Kim testified in his deposition that Giga could not pay its debts to manufacturers in the ordinary course of business. (Kim Dep. 29-30, 33-34.) Moreover, CS helped formed Giga as a new corporation precisely because he had incurred significant debt to manufacturers under his previous company and could no longer secure or maintain financial relationships with the manufacturers. (*Id.* at 30.) When Giga faced credit stress with its vendors, it attempted to

renegotiate its contractual obligations and secure upfront payment from Interkal to compensate for its financial instability, leading to the present legal action. (Pl. Mot. Ex. M.)

The lack of corporate formalities and undercapitalization do not support a prima facie case that Kim is the alter ego of Giga, however. Giga was not a "mere instrumentality" of Kim, nor did Kim maintain "ownership and control" over the corporation. At most relevant times, Kim considered CS to be the "boss," the owner of Giga. (Kim. Dep. 23, 25.) It was CS who entered into contracts and had sole authority to control Giga's finances. (*Id.* at 27-29.) It was CS who used Giga for his personal purposes to re-establish his own business relationships with vendors in Taiwan, Korea, and China. (*Id.* at 30-32.) It was CS who coordinated facility rentals and manufacturing warehouses with Giga Manufacturing, a separate company from Giga Solutions. (*Id.* at 21-24.) Perhaps CS was the alter ego of Giga as the de facto owner, but Kim was not. *See Foodland Distrib.*, 559 N.W.2d at 457 (piercing corporate veil to find de facto owner and operator of grocery store liable for purchases).

Moreover, Kim has not used Giga as a means to commit any fraud, wrong, or misuse related to Plaintiff requiring the equitable remedy of piercing the corporate veil. *See Solomon v. Western Hills Dev. Co.*, 312 N.W.2d 428, 263-64 (Mich. Ct. App. 1981). Although Kim admits that he was motivated to form Giga in order to reside legally in the United States, Plaintiff has failed to show Kim subsequently used the corporate form for illegitimate ends. *Foodland Distrib.*, 559 N.W.2d at 382. Giga is not merely a sham corporation. Kim himself

10

played an integral role in establishing contact with Interkal and providing service under their contract, and Kim has now asserted control over the corporation.

Nor has Plaintiff shown that Kim diverted company funds for personal use, made representations that he would personally provide financial backing, or commingled company and personal assets. *See Endsley Elec.*, 378 S.W.3d (declining to pierce the corporate veil where defendant's corporate charter was forfeited by the Secretary of State; the company lacked adequate capital to meet financial obligations; and the company did not keep separate books and records). Plaintiff has shown that Giga is a poorly managed company that may have bit off more business than it could chew. This is not sufficient, however, to make a prima facie showing that Giga is the alter ego of Kim. Therefore, this Court may not exercise personal jurisdiction over Kim under an alter ego theory.

### V. Successor Liability as to 2F

Jurisdiction over 2F is appropriate, says Plaintiff, because 2F is the successor of Giga. In its response to Defendant's motion to dismiss, Plaintiff has failed to demonstrate that 2F is a successor to or continuation of Giga under either Michigan or Texas law.

"Texas 'strongly embraces' a 'nonliability' rule for corporate successors." *E-Quest Mgmt., LLC v. Shaw*, 433 S.W.3d 18, 23 (Tex. App. 2013) (citing *Lockheed Martin Corp. v. Gordon*, 16 S.W.3d 127, 139 (Tex. App. 2000)). By Texas statute, a successor may acquire the assets of the corporation without incurring any of the predecessor's liabilities unless the

11

successor expressly assumes those liabilities. *Id*. Because Plaintiff has not demonstrated that 2F expressly assumed Giga's liabilities, 2F is not liable in this suit under Texas law.

Under Michigan law, a successor in a merger assumes its predecessor's liabilities, but a purchaser of assets for cash does not assume liability unless one of five narrow exceptions applies. *Lakeview Commons v. Empower Yourself*, 802 N.W.2d 712, 715-16 (Mich. Ct. App. 2010) (citing *Foster v. Cone-Blanchard Mach. Co.*, 597 N.W.2d 506, 510-11 (Mich. 1999)). *See also C.T. Charlton & Assoc., Inc. V. Thule, Inc.*, 541 F. App'x 549, 552-53 (6th Cir. 2013). Because Giga Solutions continues to exist and operate, and 2F has not assumed its assets or general business operations, Plaintiff has failed to demonstrate even a prima facie case that 2F is the successor of Giga in a merger or that 2F purchased Giga's assets for cash. Therefore, a theory of successor liability cannot support personal jurisdiction over 2F.

## VI. Conclusion

The Court is not satisfied that Plaintiff has demonstrated a prima facie case that Kim is the alter ego of Giga, nor that 2F is a mere continuation of Giga. Without such a showing, Court may not exercise personal jurisdiction over either Myung Kim or 2F, Inc. under Plaintiff's theories.

An order consistent with this opinion will be entered.

Dated: January 14, 2015        /s/ Robert Holmes Bell
                                                                         ROBERT HOLMES BELL
                                                                        UNITED STATES DISTRICT JUDGE